IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
CHICAGO DIVISION

| | |
|---|---|
| LKQ CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL INSURANCE COMPANY,<br><br>Defendant. | Case No. |

## COMPLAINT

Plaintiff LKQ Corporation ("LKQ"), for its Complaint against Defendant Federal Insurance Company ("Federal"), alleges as follows:

## INTRODUCTION

1. LKQ brings this action against Federal for its failure to honor its obligations under a $10 million commercial crime insurance policy. Despite Federal being paid substantial premiums for this coverage, Federal contends the insurance policy need not respond to pay covered loss LKQ incurred as a result of thousands of tons of valuable scrap metal ("frag") that were stolen from a LKQ subsidiary—AIM Recycling Florida, LLC—through a criminal operation carried out by certain former AIM employees and others (the "Theft").

2. Between 2015 and 2017, the former AIM employees conspired with other criminal actors to steal over $10 million worth of frag from AIM's metal shredder operation in Davie, Florida ("Shredder Operation").

3. After becoming aware of large, unexplained inventory discrepancies at the Shredder Operation beginning in October 2017, LKQ investigated the matter and learned that a criminal ring involving AIM employees had carried out a scheme of stealing frag from the

1

Shredder Operation, selling it to another scrap metal company involved in the criminal scheme, and manipulating AIM's company records to hide the Theft.

4. The loss sustained by LKQ at the hands of its dishonest employees falls squarely within the risks Federal agreed to cover under the commercial crime policy it sold to LKQ.

5. Nevertheless, Federal has wrongfully denied coverage for the Theft under the policy, alleging that the Theft was not "Discovered" (as that term is defined in the policy) until January 2018, after the termination of the policy.

6. As a result of Federal's wrongful denial of coverage, LKQ files this action for breach of contract and a declaratory judgment establishing that it is entitled to receive the benefit of the insurance coverage it purchased in compensation for the loss it sustained from the Theft.

## PARTIES

7. Plaintiff LKQ is a corporation organized under the laws of the State of Delaware, with its principal place of business in Chicago, Illinois.

8. Defendant Federal is an insurance company engaged in the business of selling insurance contracts to commercial entities such as LKQ in Illinois and elsewhere. Upon information and belief, Federal is incorporated in the State of Indiana and maintains its principal place of business in New Jersey.

9. Federal provided commercial crime insurance coverage to LKQ under Executive Protection Portfolio – Crime Coverage Policy No. 8182-8142 (the "Policy") for the policy period from December 31, 2016 to December 31, 2017 (the "Policy Period"). Federal issued the Policy to LKQ, and the Policy provides insurance coverage to LKQ and its subsidiaries for various types of crime, as outlined in the Policy. Federal delivered the Policy to LKQ at its headquarters in Chicago, Illinois. In exchange for the Policy and from its Chicago headquarters, LKQ paid a

premium to Federal of $80,000.00. A true and correct copy of the Policy is attached as Exhibit A.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11. This Court has jurisdiction to grant declaratory relief under 28 U.S.C. § 2201 because an actual controversy exists between the parties as to their respective rights and obligations under the Policy with respect to the Theft.

12. Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to LKQ's insurance claim occurred in the Northern District of Illinois—Chicago Division.

## FACTUAL ALLEGATIONS

13. LKQ incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1-12 above.

### A. The Theft

14. The Shredder Operation in Davie, Florida involves purchasing end-of-life crushed cars and metal and processing the material through shredding machines. The shredded product includes frag, which is then sold to third-parties for various uses.

15. Based on inventory analysis at the Shredder Operation for August 2017, Jim DeCarlo (LKQ Region Controller) identified unusually high inventory balances on the Operation's books.

16. In or around September 2017, Mr. DeCarlo and Dudley Smith (AIM Board Manager) observed and discussed the unusually high inventory balances.

17. In early October 2017, Mr. Smith reviewed the Shredder Operation's monthly financials for September 2017 and again identified unusually large inventory balances.

18. At the time, Mr. Smith had doubts that the Shredder Operation could store onsite the unusually large amount of material reflected on the inventory balances. Mr. Smith expressed this concern to Walter Griesseier (AIM employee & General Manager of the Shredder Operation).

19. At that time in October 2017, Mr. Smith believed there was a possibility that one or more employees were stealing frag from the Shredder Operation.

20. In early November 2017, the monthly financials for October 2017 again showed an unusually large inventory balance.

21. At that point, Mr. Smith strongly suspected that one or more employees were stealing frag from the Shredder Operation.

22. Mr. Smith expressed his view that the unusually large inventory amounts could not fit onsite, and that employee theft was occurring, with Mr. DeCarlo and Mr. Griesseier in early November 2017.

23. By mid-November 2017, Mr. Smith was virtually certain that employee theft was occurring.

24. In early December 2017, the Shredder Operation's inventory system again showed unusually large amounts of inventory onsite; however, a physical observation of the site identified a drastically lower amount of inventory than shown in the inventory system.

25. Accordingly, in December 2017 LKQ recorded an inventory write-down of approximately $2.4 million to account for the missing frag.

4

26. At this point in December 2017, Mr. Smith was certain that employee theft was occurring.

27. While the amount of stolen frag had not been conclusively determined, in December 2017 LKQ had an initial understanding of the scope of the theft in that approximately 16,000 tons of frag were missing.

28. Beginning on or around December 11, 2017, LKQ management investigated its assessment of the employee theft, engaging in in-person discussions and internal email and phone exchanges regarding the significant, unexplained loss of frag identified for November 2017.

29. Also in December 2017, LKQ conducted a "frag production analysis" to investigate the missing frag identified on the Shredder Operation's inventory records.

30. This initial analysis showed a loss of approximately 19,763 net tons of frag for the 10-month period ending December 31, 2017.

31. Thereafter, LKQ continued to analyze the missing frag and furthered discovered net frag losses of approximately 4,125 tons in 2015, 15,485 tons in 2016, and 19,496 tons in 2017.

32. On January 17, 2018, Pedro Torres (LKQ employee & Truck Scale Supervisor) confessed to Mr. Griesseier and Mr. Fritz Gerding of his involvement in a large-scale frag theft scheme being carried out by LKQ and AIM employees.

33. In total, 13 employees and independent contractors were identified as having been involved in the Theft.

34. The Theft involved employees in various positions at the Shredder Operation manipulating inventory records, stealing substantial amounts of valuable frag, and transporting

and selling the stolen frag to a third-party metal company involved in the scheme, Metals USA, Inc. ("Metals USA").

35. The payments made by Metals USA were shared among the dishonest employees for their various roles in the Theft.

36. In total, the Theft resulted in over $10 million worth of frag being stolen from LKQ by the dishonest employees.

37. The FBI is carrying out an independent investigation of the Theft.

**B.     The Policy**

38. The Policy contains multiple insuring agreements and provides broad coverage to LKQ for loss from criminal acts of dishonest employees and third-parties, including (among other crime) loss of money, securities, and property.

39. Insuring Clause 1 of the Policy (as amended by Endorsement No. 4), "Employee Theft Coverage," covers loss of money, securities, and property resulting from employee theft up to a limit of $10,000,000.  LKQ has a $500,000 self-insured retention under the Policy.

40. Insuring Clause 1 (as amended by Endorsement No. 4) contains the following insuring agreement:

> [Federal] shall pay [LKQ] for direct loss of Money, Securities or Property sustained by an Insured resulting from Theft or Forgery committed by an Employee, whether identified or not, acting alone or in collusion with others.

41. "Property" is defined to mean "tangible property other than Money or Securities."

42. "Insured" is defined to include "any Organization," which in turn is defined to include "LKQ and its Subsidiaries."

43. "Subsidiary" is defined to include "any organization while more than fifty percent (50%) of the outstanding securities or voting rights representing the present right to vote for

6

election of or to appoint directors, members of the Board of Managers, or management committee members of such organization are owned or controlled, directly or indirectly, in any combination, by one or more Organizations."

44. "Theft" is defined to include "the unlawful taking of . . . Property to the deprivation of . . . an Insured . . . ."

45. "Employee" (as amended by Endorsement No. 29) is defined to include, among other individuals, a:

> (i) natural person while in the regular service of an Organization in the ordinary course of such Organization's business, whom such Organization compensates by Salary and has the right to govern and direct in the performance of such service, including any part-time or seasonal employee;
>
> (ii) natural person while in the regular service of an Organization in the ordinary course of such Organization's business, whom such Organization has the right to govern and direct in the performance of such service and is assigned to perform such service by any agency furnishing leased personnel or temporary personnel on a contingent or part-time basis; provided that Employee shall not include such a natural person, and no coverage will be available under this coverage section for loss caused by such a natural person, if such loss is covered under any bond, indemnity or insurance held by the agency furnishing such personnel

46. "Discovery" or "Discovered" is defined to mean:

> Discovery or Discovered means an Executive or Insurance Representative has become aware of facts which would cause a reasonable person to assume that a loss of a type covered by this coverage section has occurred or acts have taken place that may subsequently result in a loss of a type covered by this coverage section. This includes loss:
>
> (a) sustained prior to the inception date of any coverage under this coverage section;
>
> (b) which is within the applicable Retention as set forth in Item 3 of the Declarations for this coverage section; or
>
> (c) for which the exact amount or details are unknown.

Discovery or Discovered shall not include knowledge acquired by an Executive or Insurance Representative acting alone in a Theft or Forgery, or acting in collusion with any Employee in a Theft or Forgery.

47. "Executive" (as amended by Endorsement No. 2) is defined to mean:

Executive means any natural person specified below:

(a) duly elected or appointed director, officer, trustee, member of the Board of Managers or management committee member of an Organization chartered in the United States of America;

(b) in-house general counsel of an Organization chartered in the United States of America;

(c) equivalent positions of (a) or (b) above in an Organization chartered in any other jurisdiction anywhere in the world; or

(d) a partner of an Organization while engaged in the regular service of such Organization.

48. "Insurance Representative" is defined to mean "any Employee, including a risk manager, designated to represent an Insured for the purpose of effecting and maintaining insurance."

49. Endorsement No. 22 amends Exclusion 19 of the Policy to provide:

No coverage will be available under this coverage section for:

(a) loss unless sustained by an Insured prior to the termination of this coverage section as to such Insured, and Discovered and written notice thereof is given to [Federal] within ninety (90) days following such termination;

(b) loss unless sustained prior to the termination of any Insuring Clause or any particular coverage offered under any Insuring Clause, and Discovered and written notice thereof is given to [Federal] within ninety (90) days following such termination; or

(c) loss unless sustained prior to the termination of this coverage section in its entirety, and Discovered and written notice thereof is given to [Federal] within ninety (90) days following such termination;

provided that in no event will coverage be available under this coverage section for such loss if such loss is covered under any renewal or

8

replacement of this coverage section or any Insuring Clause or any particular coverage offered under any Insuring Clause issued by [Federal] or by any affiliate of [Federal].

50. Section 27 of the Policy provides, in part:

It is a condition precedent to coverage hereunder that, upon Discovery, [LKQ] will:

(a) give written notice to [Federal] at the earliest practicable moment, and in no event later than ninety (90) days after such Discovery;

(b) furnish affirmative proof of loss with full particulars to [Federal] at the earliest practicable moment, and in no event later than six (6) months after such Discovery;

(c) submit to examination under oath at [Federal]'s request;

(d) produce all pertinent records at such reasonable times and places as [Federal] shall designate; and

(e) provide full cooperation with [Federal] in all matters pertaining to a loss or claim.

### C. Communications Between LKQ and Federal

51. On January 26, 2018, LKQ's insurance broker submitted a "Notice of Crime Loss" under the Policy to Federal, advising Federal of the approximately $2.4 million inventory write-off recorded in November 2017 and that the loss of frag was believed to be a result of theft by dishonest employees. The letter further advised Federal that LKQ's investigation into the scope of the Theft was ongoing, and LKQ requested an extension of time to provide a proof of loss through and including July 18, 2018.

52. On February 14, 2018, Federal wrote to LKQ, acknowledged submittal of the Theft claim under the Policy, and requested an "affirmative proof of loss."

53. In response, on or around April 3, 2018, LKQ provided Federal with an initial proof of loss, which included a detailed description of the Theft and the pending civil suit LKQ is prosecuting against the former employees.

54. On or around April 30, 2018, LKQ supplemented its proof of loss and provided additional details to Federal regarding the Theft.

55. On or around June 28, 2018, LKQ provided Federal with additional comprehensive information on the Theft and detailed responses to Federal's inquiries, including, among other information, spreadsheets detailing the amounts of frag stolen in the Theft and written accounts by LKQ management describing the company's discovery of facts relating to the Theft in 2017.

56. On or around June 29, 2018, at Federal's request, LKQ submitted the names and positions of the dishonest employees involved in the Theft.

57. On July 13, 2018, LKQ received a letter from Federal disclaiming coverage for the Theft under the Policy.

58. Relying upon Endorsement No. 17 of the Policy, Federal's letter advised that it had determined that no potential coverage was available under the Policy because, as Federal alleged, the Theft was not "Discovered" (as that term is defined in the Policy) until January 2018, after the termination of the Policy.

59. Federal claimed in this letter that Discovery did not occur in 2017 (during the Policy Period) because the facts known to LKQ in 2017 would not "cause a 'reasonable person' to assume that a loss of the type covered by the [Policy] occurred or acts have taken place that may subsequently result in a loss . . . ." Specifically, Federal alleged Discovery did not occur until January 2018 after Mr. Torres had admitted to his involvement in the Theft and LKQ had completed its frag analysis investigation.

60. Federal's letter also claimed that Endorsement No. 22 to the Policy did not apply because it was first added to a previous policy Federal sold to LKQ in 2015 "due to a mutual mistake" between LKQ and Federal.

61. Endorsement No. 22 provides that loss is covered under the Policy if it is "sustained prior to the termination [of the Policy], and Discovered and written notice thereof is given to [Federal] within ninety (90) days following . . . termination [of the Policy]."

### D. Coverage Dispute Between LKQ and Federal

62. LKQ has complied with and satisfied all conditions precedent for coverage under the Policy with respect to the Theft.

63. The Theft constitutes a loss covered under Insuring Clause 1, "Employee Theft Coverage" (as amended by Endorsement No. 4) because it is "direct loss of . . . Property sustained by an Insured resulting from Theft . . . committed by an Employee, whether identified or not, acting alone or in collusion with others."

64. The Theft was "Discovered" (as that term is defined in the Policy) before the end of the Policy Period.

65. Further, Endorsement No. 22 to the Policy extended the period in which LKQ could "Discover" and report theft to 90 days after termination of the Policy, or March 31, 2018.

66. Federal's July 13, 2018 letter states that LKQ's "Discovery" of the Theft occurred in January 2018.

67. Thus, while "Discovery" by LKQ of the loss actually occurred in 2017, before termination of the Policy, even if Federal were correct that "Discovery" occurred in January 2018, "Discovery" still occurred within the 90 day time allowed for under Endorsement No. 22.

68. The Theft was timely reported by LKQ to Federal on January 26, 2018.

69. LKQ also timely furnished an affirmative proof of loss for the Theft on April 3, 2018, and thereafter supplemented the proof of loss with additional information on April 30, June 28, and June 29, 2018.

70. LKQ has promptly produced additional information and materials in response to Federal's requests, and LKQ has otherwise provided Federal with full cooperation in all matters pertaining to the Theft.

71. The loss directly resulting from the Theft exceeds $10 million, and thus exceeds LKQ's $500,000 self-insured retention under the Policy.

72. No exclusion or limitation in the Policy limits or precludes coverage for the Theft.

73. Despite LKQ's entitlement to coverage under the Policy, Federal has denied coverage for the Theft.

## COUNT I
## BREACH OF CONTRACT

74. LKQ incorporates by reference, as if fully set forth herein, the facts set forth in paragraphs 1-73 above.

75. The Policy is an insurance contract pursuant to which Federal was paid a substantial premium in exchange for providing broad commercial crime insurance coverage, including coverage for the Theft.

76. By unreasonably refusing to cover the Theft up to the limit of liability of the Policy, Federal has expressly and wrongfully repudiated its coverage obligations and declined to honor the promises it made when it issued the Policy.

77. Federal's wrongful repudiation of its coverage obligations to LKQ is a breach of the Policy.

78. As a result of this breach of the Policy, and in light of LKQ's loss of over $10 million of valuable frag as a direct result of the Theft, LKQ has sustained substantial damages for which Federal is liable to LKQ up to the Policy's $10 million limit of liability.

## COUNT II
## **DECLARATORY JUDGMENT**

79. LKQ incorporates by reference, as if fully set forth herein, the facts set forth in paragraphs 1-78 above.

80. The Policy is an insurance contract for which LKQ paid Federal a substantial premium in exchange for crime insurance coverage, including coverage for loss resulting from the Theft.

81. LKQ's loss incurred from the Theft exceeds LKQ's $500,000 self-insured retention under the Policy.

82. Federal is liable to LKQ for any loss in excess of $500,000 up to the $10 million limit of the Policy.

83. The parties dispute Federal's coverage obligations under the Policy, and an actual case or controversy exists regarding LKQ's rights and Federal's obligations under the Policy to pay loss incurred by LKQ from the Theft.

84. Pursuant to 28 U.S.C. § 2201, LKQ seeks a declaratory judgment from this Court establishing the following:

   (i) LKQ first Discovered the loss as defined in the Policy in December 2017, before the termination of the Policy Period;

   (ii) Pursuant to Endorsement No. 22 of the Policy, the Policy permits LKQ to first Discover and provide written notice of a loss within 90 days of the Policy's December 31, 2017 termination;

   (iii) LKQ timely Discovered and provided written notice of the loss to Federal in accordance with Endorsement No. 22 of the Policy;

   (iv) LKQ's loss arising from the Theft is covered under the Policy; and

   (v) Federal is obligated to pay LKQ for the full amount of LKQ's loss arising from the Theft, subject to LKQ's $500,000 self-insured retention, up to the Policy's $10 million limit of liability.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully prays that the Court:

(1)     enter judgment on Count I of the Complaint in favor of LKQ and against Federal;

(2)     enter judgment on Count I of the Complaint for compensatory damages in favor of LKQ and against Federal to compensate LKQ for the loss sustained as a result of Federal's breach of the Policy and refusal to pay up to the limit of the Policy for LKQ's loss from the Theft;

(3)     enter a declaratory judgment on Count II of the Complaint in favor of LKQ and against Federal, declaring as follows:

    (i)     LKQ first Discovered the loss as defined in the Policy in December 2017, before the termination of the Policy Period;

    (ii)    Pursuant to Endorsement No. 22 of the Policy, the Policy permits LKQ to first Discover and provide written notice of a loss within 90 days of the Policy's December 31, 2017 termination;

    (iii)   LKQ timely Discovered and provided written notice of the loss to Federal in accordance with Endorsement No. 22 of the Policy;

    (iv)    LKQ's loss arising from the Theft is covered under the Policy; and

    (v)     Federal is obligated to pay LKQ for the full amount of LKQ's loss arising from the Theft, subject to LKQ's $500,000 self-insured retention, up to the Policy's $10 million limit of liability.

(4)     award to LKQ and against Federal prejudgment interest, to be calculated according to law, to compensate LKQ for the loss of use of funds caused by Federal's wrongful refusal to pay LKQ for loss it incurred from the Theft;

(5)     award to LKQ and against Federal all costs incurred in obtaining the relief sought in this Complaint, including attorneys' fees; and

(6)     award LKQ such other, further, and additional relief as this Court deems just and appropriate.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, LKQ hereby demands that all claims in this action be tried to a jury.

Dated: August 1, 2018

Respectfully submitted,

*/s/ Jade R. Lambert*_____
Jade R. Lambert
**KING & SPALDING LLP**
King & Spalding LLP
444 West Lake Street
Suite 1650
Chicago, IL 60606
jlambert@kslaw.com
T: 312-995-6333

*Attorneys for Plaintiff LKQ Corporation*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 1, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

<em>/s/ Jade R. Lambert</em>